Mr. D. Alessandro for Petitioner's MTSC, Mr. Demarest for Petitioner's Silver Mining Co-Op Company LZNL, Ms. Kasher for Respondent FERC, and Mr. Massey for Intervenor PSC of Wisconsin. Mr. D. Alessandro for Petitioner's Silver Mining Co-Op Company LZNL, Ms. Kasher for Intervenor PSC of Wisconsin, and Mr. Massey for Intervenor PSC of Wisconsin, and Ms. Kasher for Intervenor PSC of Wisconsin, and Ms. Kasher for Intervenor PSC of Wisconsin, and Ms. Kasher for Intervenor PSC of Wisconsin, and Ms. Kasher for Intervenor PSC of Wisconsin, and Ms. Kasher for Intervenor  of the benefits of the Crescale SSR unit to Wisconsin, as compared in the middle there to an allocation of 92% of the cost of that unit to Michigan, I mean, excuse me, to Wisconsin, more than twice the benefits. Based on that evidence, FERC found that the existing pro rata allocation of SSR cost was unjust and unreasonable. But the commission acknowledged that the preliminary load shed study was not complete and directed MISO to complete and file the final study. The final study, on the right hand corner of the chart, indicated that Wisconsin received 86% of the benefits from the Crescale unit, reasonably commensurate with the 92% of the cost allocated under the existing methodology. But respondent claims, at 27 of its brief, that both studies are probative evidence of the invalidity of the existing pro rata allocation method. But that claim ignores two important points. One, the incomplete preliminary study was replaced by a complete study, and the evidence in the complete study that 86% of the benefits from the Crescale unit flowed to Wisconsin completely undermined FERC's finding that the existing pro rata allocation bears little, if any, relation to the benefits. Now respondent appears to recognize the vulnerability of relying solely on the preliminary load study by arguing, at pages 27 and 28 of their brief, that the language of the tariff itself is unjust and unreasonable because it doesn't make any reference to benefits. But FERC never made that finding. If you review paragraphs 59 and 60 of the July 29 order, which is at JA 08 and 09. That's what I'm trying to get in front of me right now. Okay. Yeah. When you look at JA. That's what you're complaining for, right? When you look at JA 06, 08, and 09, those two paragraphs, which are cited in FERC's brief for the proposition that the tariff language itself is unjust and unreasonable, they make clear that the sole basis for FERC's finding of unjustness and unreasonableness is the preliminary load shed study. Well, actually, paragraph 61, doesn't it say more than that? Well, it's referring to the application of the tariff language through the preliminary load shed study, and the results of that study demonstrate the unjustness and unreasonableness of the allocation. Well, indeed, there are no studies or other evidence in the record. Do you see that sentence in paragraph 61? Yes. Other than the preliminary study, which at that point in time was the only study in the record. It was included with the complaint. The court noted that that is the only study, the preliminary study. So that's what FERC was relying on, and they said there's no other study in the record. All right. So then we get these studies in the record later on. Yes. The final study came in later on, Your Honor, in compliance with FERC's directive. Right. And the final study is the one that showed the completely opposite result of the preliminary study. All right. Where is FERC's response on that? Excuse me, Your Honor? See, I'm trying to understand. FERC made a decision at step one. Yes. Based on the records that were before it. Yes. It said the fact that this is preliminary doesn't matter because it shows the basic allocation problem and the methodological problem. All right. It showed that the benefits were only 42 percent compared to the cost of 92 percent. So then FERC in that order says, to me so, you know, prepare this study. Yes. And then the rest of the orders are basically fussing about the study, and FERC wants more detail, more detail, more detail. Yes, Your Honor. All right. So where are we? Are we in the third or the fourth order? There were a total of four studies. The final study was the second one. But I would note, Your Honor— I'm just trying to find, and I'll ask FERC counsel, where I'm going to find the response that you're saying was required to this later study. Well, I would refer you to— In other words, agencies, you know, operate and studies come in, studies come in, studies come in. But the initial decision was made based on the record before it. All right. Then we have four later orders, and then we have a petition for reconsideration. Yes, Your Honor. What happened is the commission issued their initial order on July 29th and directed that the study be completed, and that was filed on August 11th. But the state-by-state breakdown on this chart was not placed in the record until September 2nd, and that is at JA 984, Your Honor. And that's— So I thought what FERC— Yeah. Well, we'll ask the agency too, but with respect to this study that you're calling the final study, which has the 86 percent figure, I thought that FERC had said—and this is at 35 to 36 of its brief—the commission did not rely on that version of the final load shed study because it was superseded by an updated version. Yes, Your Honor. They did say that. It's on six local balancing authorities instead of the five. And on that one, the figures go back in the direction that you don't like. That's exactly right, Your Honor. But I have to point out that the superseding study they referred to was a completely new study based on six local balancing authority areas, which did not go into effect until December 1, six months after the initial order and eight months after the complaint was filed. It had nothing to do with the original preliminary study or the final study that was filed by MISO on August 11th, which were both based on five local balancing authority areas. But which way does that cut? That cuts our way, Your Honor, because the complaint was filed based on five local balancing authority areas, and the complaint included reference to the preliminary load shed study. And the final load shed study, which went our way, was also based on the five local balancing authority areas. So it wasn't until there was a change approved by NERC to add an additional balancing authority area, which became effective December 1, that a new study was made based on the six local balancing authority areas. In our view, it would be improper to retroactively rely on a forward-looking change that occurred long after the filing of the complaint. So in terms of this study, the commission says this discrepancy, the 6%, was never presented to the agency. It was not presented, Your Honor, because the reference to the joint appendix at 984, where that information first came into the record, was five days after we filed our application for rehearing. What we did say in our application for rehearing, Your Honor, is that the credibility of the preliminary study was undermined because MISO was the author of that study. MISO warned FERC that the study was both incomplete and needed further analysis. And that's at JA 791, the April 28 filing. So did you ever bring this 6% to the commission's attention? I didn't hear you. Did you ever bring this 6% discrepancy that you reference in your reply brief to the agency's attention? We did not, Your Honor. It became apparent that it would not have mattered that the protest was filed against When Wisconsin saw the results of the final study, protests were filed, and the subsequent study was filed on the six local balancing authority areas. And it's clear that FERC would have arrived at the same decision. But we did not, after our application for rehearing, make further arguments on the differential that you're referring to. All right. I see my time is up. If there are no further questions, I'd like to turn it over to Mr. Demarest. Thank you. Thank you. Good morning, Your Honor. May it please the Court, my name is William Demarest, and I'm appearing here today on behalf of the joint petitioners. Even if the Court determines that FERC's decision in July of 2014, that MISO's tariff provision was unjust and unreasonable, is based upon substantial evidence, the argument that Mr. D'Alessandro has just addressed, this Court must still reverse, because the exceeds its authority under the statute. On its face, Section 206A of the POWER Act prohibits the action FERC took here, and nothing in Section 309 of the Act authorizes that action. FERC's position in this case is that refunds are warranted based upon equitable considerations. However, because refunds can only be funded out of surcharges, if FERC cannot order surcharges, an unjust situation would arise, and therefore, under Excel and TNA, FERC can order surcharges to pay for the refunds that FERC views are warranted. That's the Commission's position. That rationale, however, puts the cart before the horse, and it turns the legal error line of cases upside down. This is not a legal error case, and the Commission has not cited a single case outside of the context of legal error in which this Court has concluded that a remedy may be in the retroactive rate increase expressly prohibited by Section 309, pardon me, by Section 206A of the Act. This case comes down to why do you say it's expressly prohibited? Where is the language that expressly prohibits it? The language that is expressly prohibited is the language in Section 206A, which says that the Commission may fix the rate thereafter to be observed. And the Court in the City of Anaheim case expressly found that language is clear and unambiguous and prohibits retroactive rate increases. This is not a Section 205 refund case. The Commission goes to great length in its brief. But that's not necessarily to the exclusion of the proposition that under 309, there's an authority to construct an effective remedy by requiring a surcharge in circumstances like exist in this case. Well, I would disagree with that, Your Honor, because all of this Court's cases construing Section 309, going back to Niagara-Mohawk and coming right up through TNA, have said that the Commission's authority here to fashion a remedy under 309 cannot be inconsistent with an express provision of the statute. It must be consistent with the purposes and other provisions of the Act. And in the cases that have been cited, such as Niagara-Mohawk, there was no statutory prohibition against the action that was taken under Section 309. So if there's, if we read a, I don't know the, is it 206A? All I know is it's A24EA, but you all refer, people in the know refer to it as 206A? 206A. So if we read 206A, as you're suggesting, which is that it prohibits surcharges, then how does that square with what, I guess it would be 206C says about surcharges, since 206C specifically says, at least, it talks about not allowing it in circumstances, but the language it uses is, should be paid through an increase in the cost to be paid by other electric utility companies, which is a surcharge. So that seems to presuppose that at least surcharges are allowable in some situations. Allowable in the situation governed by Section 206C, but Section 206C, we don't believe applies here. And we believe that the argument that you can, you can infer from the congressional action to expand the scope of refund authority under Section 206B in 1988, and the concomitant language in Section 206C, the argument that is made in reliance on those two provisions is that there's a negative inference that applies to Section 206A. We don't believe that negative inference is appropriate, given the fact that Congress expressly failed to amend Section 206A. Congress had to be aware of the existence of 206A's absolute prohibition, which has been recognized for many years, and chose, for whatever reason, not to amend 206A. I think it's too much of a reach to rely on a negative inference from the relationship between 206B and 206C to reach the conclusion that, therefore, the prohibition against retroactive rate increases in 206A should be overridden. The only time that this Court has determined that the 206A prohibition may be overridden is in the case of legal error cases. And this is not a case that involves legal error. And to the suggestion made by interveners that somehow this case should be a legal error case, FERC never concluded that this was a legal error case. The complaint never raises the issues that the interveners rely on to claim that this case would be shoehorned into the legal error line of cases. We believe the legal error line of cases is controlling. And absent legal error, there's no evidence, there's no indication that the prohibition against retroactive rate increases should be overridden. So I know there's a limit to what you can do with, or what a court can properly do with the titles of subsection. But looking at what Congress left, as I understand part of the intervener's argument, it's that you really have to read B and C together. And B talks about refunds. And then C talks about these considerations that you take into account, et cetera. And as I understand your argument in part, other than it's too great a stretch, is that C is addressing very specific circumstances that are not present here. Yes, Your Honor. And that the 309 broad language, almost the necessary and proper authorization, simply can't rest on this, what did you just call it? Tenuous negative inference. Negative inference. Yes, Your Honor. Rather, Congress has to affirmatively provide the agency with authority. And that a broad provision in 309 cannot fill the gap absent Congress' express determination? I would say, Your Honor, that 309 is expansive. That 309 grants for very broad authority. But it is not unconstrained. It's not unlimited. It is limited by the other provisions of the Act, which if the other provisions of the Act say that something may not be done, 309 cannot be used under those circumstances to grant action that other provisions of the Act expressly prohibit. And all of the cases applying 309 have recognized that reality. Starting with Niagara-Mohawk and right up to TNA, where TNA says that this authority to adjust unjust situations in a legal error case, which clearly TNA is, that that authority cannot be used to violate a specific stricture under the Act. So what's your understanding of the origin of the legal error decisions? My understanding of the legal error decisions, Your Honor, is they are, in truth, not an exception to the statute, but rather they are a judicial understanding that where the agency has made a legal error, to be consistent with the purposes of the statute, there may be remedies fashioned. And those remedies, admittedly, could involve a retroactive surcharge. But that's because you're putting the parties back in the position they would have been in under the statute. But for the agency's error. Yes, Your Honor. So you don't want, I'm just trying to understand, you don't want to visit on the parties something that the agency itself has acknowledged was error. That's correct, Your Honor. So in this case, Burke argues, we have, let's ignore your co-counsel's first argument, if we can for the moment, that issue. We have such an outrageous situation here, where one group has been paying for services another has received. So refunds are clearly warranted. And Firk goes on at length as to why. But the problem is, NISO doesn't have any resources. So do you just have to sweep the unjust and unreasonable focus here under the rug? And Firk says no, because we do have sort of a necessary and appropriate authorization. And in this limited circumstance, it says that authority is sufficient. I want your response. I understand your response about 206A. I would have two responses to that, Your Honor. The first is that the result you describe is a consequence of the way the statute is drafted and the balancing that Congress made in striking a balance between 206A and 206B, as described in both the city of Anaheim and city of Reading. And that that balance sometimes leads to results in which the agency lacks authority to grant retroactive relief. But the parties are not without remedy here. We must remember that these provisions have been in effect since 2004. And in 2013, there was an SSR agreement under which the commission approved prorate allocation. And if the parties indeed believed that under the circumstances, that circumstances had changed enough, that prorate allocation was inappropriate, they had an opportunity then to complain about it. But they chose not to. When they filed their complaint, they were well aware that the remedies that the commission could grant would be limited by the statute and by the remedies that Congress prescribed. And in this case, the Congress prescribed only prospective relief, which means that the next time an SSR agreement is proposed, the different allocation mechanism would be implemented. This is a direct consequence of the two-step process that this court recognized in Amera Maine applies to 206. The first step was the July 29 decision that the existing tariff provision was unjust and unreasonable. It then took the commission until May of 2016 to fix the rate within the meaning of electric district number one that would be applied thereafter. And that is the rate that would apply in the future to SSR agreements in the ATC footprint. So the parties here, the complaining parties, are not without a remedy. They have the remedy that Congress chose to give them. And the commission doesn't have the authority to grant a remedy that the statute prohibits. And 309 doesn't authorize that. Thank you, Your Honor. Good morning. May it please the Court. Holly Caper for the commission. I think I should probably start where we just left off with the remedy issue, and I hope that I'll be able to circle back to the unjust and unreasonable original rate a little later on. I'd like to start with 309. There is no limit in 309 that says it's only for legal error or that it doesn't allow surcharges. Petitioner's counsel understands and has agreed that it is a very broad grant of authority. Specifically, it allows the commission to, quote, from the statute, carry out its existing authority. Congress gave the commission in section 206B authority to require refunds for a 15-month period, which... had no authority to grant refunds. Is that correct? Perhaps it could have under section 309. I don't know that there's a case that specifically addresses that, Your Honor. Well, obviously, you know where I'm going in the sense that we have held repeatedly that the agency is a creature of statute. It has the powers Congress has given to it. And it amended this same section 206 to authorize refunds, but in a very tailored way. So that the 309 authority, arguably, could not authorize the commission to grant refunds in excess of what Congress authorized under 206B. And the commission is not granting refunds in excess of 206B here. I understand, but... It's simply trying to carry out those refunds. Both before and after Congress enacted 206B, this court said that the commission could, in fact, require surcharges under section 309 in cases that involved a legal error-based fact pattern. Now, of course, we're not arguing that this is a legal error case here, but petitioners have pointed out nothing and I see nothing in the court's case law that suggests that that reading of 309, which says that surcharges are not prohibited and may be allowed under 309, notwithstanding section 206A, which has not changed in this course of time, nothing to say that that doesn't apply outside of the factual context of legal error. There's simply nothing there. 206... Again, Congress intended for the commission to be able to require refunds under 206B. What we have here, granted it's not legal error, is a circumstance where the commission will be unable to require those refunds because of the nonprofit status of the system operator, because this is a cost allocation case, those limited circumstances that we describe in our brief. It's unable to implement that authority unless it can do so under section 309. The court has already said surcharges are okay under 309 in other circumstances. And so all the commission is saying here is that we should be able to carry out that authority to protect consumers, going back to Niagara Mohawk, the very purpose of section 309 is to allow the commission to implement its existing authority to carry out, again, in the language of the statute, in order to serve the purpose of the statute, which is to protect consumers. Here we have the results of the final cost allocation methodology, which has nothing to do with local balancing authorities, and simply assigns costs directly to the load serving entities, the local utilities that benefit from the projects. And that shows very clearly that Michigan benefits far more, potentially nearly to the exclusion of Wisconsin. And so in those factual circumstances, 309 is broad enough, petitioners agree that it's broad, it is broad enough to take us to apply the same legal findings about the scope of the commission's authority, outside of the context of legal error, in this particular set of circumstances here. How does a refund get effectuated without a surcharge in other contexts? Ordinarily when you have a public utility that is not a non-profit, the public utility will have funds on hand to pay those. In particular cases, the shareholders can also be compelled to pay for those costs. So the standard procedure would be that the entity itself is obligated to pay? Yes. And that's why we're here. That's one of the reasons why we explained Niagara-Mohawk in such detail in our brief, and that's because in Niagara-Mohawk, 1967, the court said that the commission is supposed to use its 309 authority in order to take into account these types of new and evolving circumstances. Well, relatively speaking to the Federal Power Act, Power Act, regional transmission organizations, and independent system operators that are all non-profit public utilities, is a new and evolving circumstance, and the commission is attempting to use its full authority as it's been told to do, not just in Niagara-Mohawk, but also in Excel, also in TNA, where the court counseled the commission to be sure that it was fully examining the equities in all of these refund cases, and that it was carrying it out to the maximum effect. And in fact, Niagara-Mohawk uses that language in describing the commission's broad discretion to implement remedies, and to essentially be creative in implementing remedies. It says to maximize the effectuation of the purpose of the statute, which is consumer protection. I wanted to circle back to TNA in particular, because I think it's important to note there that the court distinguished between the remedy of refunds under 206B, and the separate matter of recoupment under 206B, and found that the commission wasn't constrained by the language of 206A with regard to recoupment the way that it would be with refunds. And so I think that by analogy, again, it's quite easy to see that surcharges are something separate from refunds, and here, it is necessary for the commission to require those surcharges to carry out its 206B refund authority. Let's see, Petitioner's Council mentioned that parties have fully available recourse. They suggest that the parties could have come to the commission sooner with their argument that the pro rata cost allocation was unjust and unreasonable. Of course, it's the study that was only driven by the retirement of the Presque Isle plant that caused the commission to see that the existing cost allocation methodology was unjust and unreasonable. But perhaps more important in the context of remedies, the short-term nature of the agreements is what really makes it necessary for the commission to have this authority to not only give the refunds, but to require the surcharges to implement them. There is no prospect of relief here. The Presque Isle system support resource agreement lasted a shorter amount of time than the refund period did. So if we don't have the ability to require the surcharges, then the Wisconsin parties are without relief. So just explain to me why these agreements go into effect that way. They automatically go into effect. Like a typical 804D-205 filing, the parties bring it to the commission, and normally there's a 60-day waiting period essentially for it to become effective. But because these units are needed for the reliability of the grid, the commission has waived that 60-day period so that the agreements become effective immediately. And that is what it did here. So the commission obviously does have the power to suspend, but if it did that, the agreement then wouldn't go into effect, the unit wouldn't be able to run, and there would be a reliability issue. So the commission certainly has good reasons for allowing that to go into effect quickly. And this is simply unlike your standard long-term power purchase agreement or even a change to a market design that you're putting into effect to be good for five years, ten years, or until a better market design comes around. It's just a different type of situation. And again, it's these types of new and evolving circumstances, the cost allocation case, the nonprofit status of the public utility, the short-term nature of the agreement, all of those things that the commission found, the equities that the commission found supported refunds, are the same things that support the commission in exercising its 309 authority here. So again, while the prior cases that the court has dealt with under Section 309 have involved a legal error factual scenario, we think that these equitable facts are more than adequate to show that the commission has its 309 authority. There's nothing in the statute, certainly, and there's nothing in the court's case law to date that says otherwise. So it's a legal necessity that the argument—in other words, in order to carry out 206B, where you have these RTOs or these ITOs, necessarily you have to be able to impose surcharges to recover the refunds, if I can. So, I mean, it's not a unique situation, arguably. I mean, now that we have this restructured grid, it could happen more frequently. It could happen more frequently, but again, it's not just the nonprofit status of the system operator, it's also the short-term nature of the agreements, and it's also the fact that it's a cost allocation case. It's not just that the system operator has this money and it's sitting on it because it overcharged and needs to give it back. That's your standard overcharge case where—so I did want to point the court to, because it was just recently issued, in Northwestern v. FERC 884, Fed 3rd, 1166 at 1184, just from last month. The court there explained a little bit more in detail about the difference between overcharge cases, which this case is not, and cost allocation cases and the distinctions there. That was a standard overcharge case where the utility had the money and simply needed to give it back. Going back to your question, Judge Srinivasan, about how does this work in a normal case, that's an example of a normal case there. Turning to the cost allocation issue and the matter of the Commission's evidentiary basis for its Step 1 finding under 824E or Section 206, what the Commission did there is it said the preliminary study is enough because it shows that it is possible to tie the costs to the benefits. When we look at the pro rata language of the tariff in the view of this preliminary study that the Commission now received, we can see it illustrates that the pro rata method does not require any connection to cost causation. No connection is required between the costs and the benefits. And so we can see that it is unjust and unreasonable. The study the Commission found was illustrative in that manner. It demonstrated the sort of inherent nature of the unjust and unreasonable pro rata approach that was in the tariff. And the Commission needed the study in order to see that. Turning to the later studies that came in, the most important thing to know about the so-called final study, which was actually the second of four studies that were ultimately done in the course of the proceeding, is that it isn't final. The Commission rejected it outright and it was replaced by another study, the third study, that also looked at allocation of costs based on local balancing areas. That's the six LBA study, if you will, that showed 99% of the benefits going to Michigan. And that study was also rejected because in the end the Commission found that allocating costs based on local balancing areas for these particular units was unjust and unreasonable. So the study that shows 86% of the benefits to Wisconsin and even the study that shows 99% of the benefits to Michigan using local balancing areas are both irrelevant to the Commission's analysis. The only way they could be relevant is that they all show it is possible to tie costs to benefits for these particular units. It is possible to implement the nexus that is required by the Court's precedent and the Commission's precedent that says the Commission needs to assign costs as closely as possible in line with benefits. And all four of the studies, but really all three of the studies that petitioners have presented arguments based upon, show that that's possible. Petitioners in their reply brief at page 25 pointed out that, or asserted that they had not been able to present argument based upon the so-called final study, the one that showed 86% of benefits to Wisconsin. I did want to just inform the Court that that's not accurate. In Verso's rehearing request, Petitioner Verso, in their rehearing request at JA 914, you will see a motion to lodge. Not included in the joint appendix is the attachment that they were attempting to lodge, which is the very study that shows the 86% of benefits to Wisconsin. I would just want to read in the accession number where that can be found, and I'm happy to provide it to the Court if necessary. It's the accession number for the Commission's eLibrary is 2014-0828-5243. So they had that information. It was in the record or in the Commission's docket before September 2nd. They attached it to their rehearing request. They could have presented argument on it. They did not, which is why when you look at the Commission's orders, you'll see that the Commission relied on the preliminary study and said in paragraph 74 of the second order in particular, that's at JA 1401, it said the preliminary study is enough. Yes, there is this new final study that has come in, and we'll address that later, but it's not relevant to our purposes here under Step 1, finding that the existing rate is unjust and unreasonable. And if there are no questions, I will leave it there, and thank you for your time. Thank you. Counsel for intervening. Good morning. Good morning. If it pleases the Court, my name is Bill Massey. I'm representing the Wisconsin Commission, an intervener in this case. I appreciate the Court's questions about the implications of Section 206C. Actually, if you read 206B and 206C together, 206C would be superfluous if 206B did not authorize surcharges, because 206C limits FERC's authority to use surcharges in the registered holding companies. If FERC did not have that authority under 206B, perhaps coupled with 309, 206C would have been completely, would be superfluous. It would have been totally unnecessary. If you parse the words closely, you can see that 206C actually begins by saying when the uses surcharges, actually uses a different term, but that's what it's talking about, then FERC's authority is limited in the case of registered holding companies. Strong implication is not limited elsewhere. If you read 206C and 206B together, Your Honors, we would argue that they remove any strictures on the application of Section 309 to do justice, which is exactly what the Commission did in this case. By the way, the 309 cases that this Court has approved do not all require legal error. The Niagara Mohawk case was not a legal error case. There are cases under the Natural Gas Act in which the Court applied Section 16 of the Natural Gas Act, which is the same thing as Section 309 of the Federal Power Act, without finding legal error. The second point I would like to make, Your Honor, is that City of Anaheim is distinguishable. City of Anaheim was a 206A case. It did not involve FERC's exercise of its refund authority. It was a rate increase case where the utility sought an increase in its revenue requirement, in its revenues. Here we have a matter where the utility is not seeking an increase in its revenues. The issue is the allocation of the revenues that are on file at the Commission. Pardon me, Judge. It is a zero-sum reallocation, unlike City of Anaheim, in which generators came in with no notice and asked for a rate increase. Here all parties were on notice. These are all very sophisticated parties that deal with MISO all the time and these RTO tariffs. They definitely understood that if FERC in the July order required refunds, that those would need to be funded with surcharges. So City of Anaheim doesn't speak to this situation at all. FERC is in its refund box here under 206B and 309. And if you read, our view is the path through this maze is if you read 206C, which sheds strong light on the meaning of 206B. And 206C basically assumes that under 206B FERC has the surcharge authority. And if you read that in connection with Section 309, you put together a legal package that is quite persuasive for FERC's use of authority in this case. This may actually be a unique case where FERC finds that all the equities favor refunds and surcharges, that MISO has no money, can't pay, so the costs have to be reallocated. There's no increase in the revenue requirement here like there was in City of Anaheim, Your Honor. Thank you. I've gone over my time. Thank you very much. Counsel for Petitioner. May it please the Court, I'd like to respond briefly to the arguments that have been made by respondent and interveners. I'd like to start by pointing out to the Court that nowhere in the proceedings below did the Commission rely on its authority under Section 309. It did cite Niagara. Cited Niagara, but it doesn't rely on Section 309 as the basis for its actions below. Moreover, the Commission did not rely on this tenuous argument presented by the interveners in Section 206C. And you may have noted that Ms. Kafer in her argument made no references to or reliance on Section 206C because the Commission below did not agree with or put forth this novel theory. With respect to T&A and the point Ms. Kafer made about recoupment, I would point out that recoupment is not prohibited by Section 206A, whereas retroactive rate increases are, and that's why T&A does not authorize the relief granted here. With respect to Ms. Kafer's point that Section 309 and the Commission's actions here were to carry out, quote, the purposes of the statute, which she referred to as protection of consumers, I would point out that that view is too narrow. This statute is a very careful balance of protection of the rights of consumers and utilities. That balance has been recognized going back to Hope Natural Gas and its progeny. And Section 206A and 206B recognize the balance of protection of consumers from rate increases versus the protection of utilities from unlimited refund exposure. And that balance remains today. And to suggest that the purposes of the statute in Section 309 can be used in contravention of one of those core balances struck by Congress reads too much into Section 309. This is a Section 206 case, not a Section 205 case. With respect to the references that Mr. Massey referred to under the Natural Gas Act, I would call the Court's attention to Public Service Commission of New York versus FERC, where this Court said we see no basis for reading NGA Section 16 as overriding the balance achieved by Sections 4 and 5, the corollaries to Sections 205 and 206 of the Federal Power Act, and find FERC's expansive view of its Section 16 powers, the equivalent to Section 309 under the Power Act, to be contrary to the purposes of the Act. And we believe that language is equally applicable here. So what's the site? The site for that case, Your Honor, is 866 Fed 2nd 487 at 491-92. Thank you. If the Court has no other questions. Thank you. Thank you, Your Honor. We'll take the case under advisory.
judges: Rogers, Srinivasan, Wilkins